# COURT OF APPEALS
## DECISION
## DATED AND FILED

## July 16, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP21**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021FA149

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE MARRIAGE OF:

ROMERO COLEMAN,

    PETITIONER-RESPONDENT,

  V.

REBECCA A. COLEMAN,

    RESPONDENT-APPELLANT.

 

APPEAL from a judgment of the circuit court for Brown County: THOMAS J. WALSH, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Rebecca Coleman appeals a judgment of divorce from her former spouse, Romero Coleman.[1]  Rebecca raises seven arguments regarding the circuit court's determination of child support and its division of the parties' property.

¶2      We reject each of Rebecca's arguments regarding the property division, and we therefore affirm the circuit court's judgment in part.  We agree with Rebecca, however, that the court erred by failing to explain why it calculated child support using an annual income of $63,300 for Rebecca, rather than $50,000.  We therefore reverse that portion of the judgment setting Romero's child support obligation, and we remand for the court to readdress that issue.  We also agree with Rebecca that the court erred by failing to address which party would be permitted to claim the parties' minor child as a dependent for income tax purposes, and we direct the court to address that issue on remand.

## BACKGROUND

¶3      The parties were married in October 2004.  Romero petitioned for divorce on February 22, 2021.  At the time of filing, the parties had two minor children, ages seventeen and fourteen.

¶4      A contested final divorce hearing took place over three days during June, August, and September of 2022.  By that time, the parties' older child was no longer a minor.  The parties reached an agreement as to the legal custody and physical placement of their remaining minor child, and the circuit court adopted

---

[1]  Because the parties share a surname, we refer to them by their first names throughout the remainder of this opinion.  Although Romero was initially represented by counsel in the circuit court, both parties are self-represented on appeal.

that agreement. The disputed issues at the contested hearing pertained to maintenance, child support, and the division of the parties' property.

¶5    The circuit court entered a written decision and order addressing those issues on December 15, 2022, and it subsequently entered a judgment of divorce incorporating that decision. As relevant to this appeal, the court ordered Romero to pay Rebecca $124 per month in child support, commencing on January 1, 2023. The court equally divided the parties' assets and debts and ordered Romero to make an equalization payment of $48,304.25 to Rebecca.

¶6    Rebecca now appeals, arguing that the circuit court erred in seven ways with respect to calculating the amount due to her for child support and the division of the parties' property. Additional facts are included below as necessary to our discussion of Rebecca's arguments.

## DISCUSSION

¶7    Both the division of property at divorce and the setting of child support are committed to the circuit court's discretion. *Modrow v. Modrow*, 2001 WI App 200, ¶9, 247 Wis. 2d 889, 634 N.W.2d 852. "We will uphold the circuit court's discretionary decision if the court makes a rational and reasoned decision and applies the correct legal standard to the facts of record." *Id.*

## I. Down payment for the marital home

¶8    The circuit court awarded the parties' marital home to Romero in the property division. Rebecca contends that when the parties purchased the marital home, they used as a down payment the proceeds from the sale of a different residence, which Rebecca had purchased prior to the marriage. Rebecca asserts

that the court should have awarded the entire amount of that down payment to her in the property division.

¶9 The circuit court specifically addressed and rejected Rebecca's argument regarding the down payment. The court correctly noted that the funds that Rebecca received from the sale of the prior home were "clearly marital"—i.e., subject to division. *See* WIS. STAT. § 767.61(2)-(3) (2021-22) (providing that all property, whether acquired before or during the marriage, is subject to a presumption of equal division at divorce, except property acquired by gift or inheritance or property purchased with funds acquired by gift or inheritance).[2]

¶10 Although a circuit court may deviate from the presumption of equal division based on, among other things, "[t]he property brought to the marriage by each party," *see* WIS. STAT. § 767.61(3)(b), the court declined to do so here. The court reasoned that: (1) the prior residence was sold in 2008, "which was approximately four years after the parties had been married and [were] sharing their household"; and (2) the check from the sale of the prior residence was made out to both Rebecca and Romero. Under these circumstances, the court stated it was "satisfied that [the sale proceeds were] joint money and no unequal division will occur as a result." The court's refusal to deviate from the presumption of equal division was not an erroneous exercise of discretion.

---

[2] There is no evidence in the record to suggest that Rebecca acquired the prior residence by gift or inheritance or purchased that residence using funds acquired by gift or inheritance, nor does Rebecca argue that she did so.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## II. Rebecca's 401(k)

¶11 The circuit court divided Rebecca's 401(k) equally between the parties via a qualified domestic relations order. Rebecca contends that "[d]uring the divorce process, both parties agreed to no changes to the [401(k)]," and "[a]ll property division sheets turned [in to] the court by both parties throughout the entire duration of this case show the [401(k)] staying whole and with Rebecca." Rebecca therefore asserts that "[t]his issue was agreed upon and did not require ruling from the court." In response, Romero asserts that there was "never any agreement to this plan" and that the division of the 401(k) "was considered a contested issue."

¶12 The record supports Romero's position. Although Romero's property division worksheet assigned the full value of the 401(k) to Rebecca, his worksheet, overall, reflected an equal division of the parties' assets and debts, resulting in an equalization payment from him to Rebecca. There is nothing in the record indicating that Rebecca and Romero reached any specific agreement with respect to the division of the 401(k) or that they informed the circuit court of any agreement regarding that asset.

¶13 Regardless, Rebecca cites no legal authority in support of the proposition that a circuit court is required to follow the parties' agreement regarding the division of a particular asset. Nor does Rebecca cite any legal authority in support of her claim that the circuit court erred by equally dividing the 401(k), particularly given the presumption of equal division set forth in WIS. STAT. § 767.61(3). We need not consider arguments that are unsupported by references to legal authority. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

5

### III. Dave's Auto Repair debt

¶14    Rebecca's property division worksheet listed a debt to Dave's Auto Repair in the amount of $2,741.68. Rebecca's worksheet divided that debt equally between the parties. In its written decision, the circuit court did not divide the Dave's Auto Repair debt, stating instead that it was "already paid using marital funds." Rebecca asserts that this statement was inaccurate because her father paid the Dave's Auto Repair debt and expects to be repaid for that amount. Notably, however, Rebecca does not provide any record citations in support of this argument.

¶15    In response, Romero asserts that while Rebecca listed the Dave's Auto Repair debt on her property division worksheet, she did not "present[]" this issue "in court or on record." Romero also argues that the debt was for repairs made to Rebecca's "personal vehicle," that there was "no discussion of or any verbal or written agreement between him, Rebecca … and her father … regarding repairs or any advancement of funds for those repairs," and that Romero is "not responsible for any funds Rebecca … may have received from her father … and/or any arrangement that may have been made between" Rebecca and her father.

¶16    In her reply brief, Rebecca "maintains [that] the auto repair bill should be split between both parties as it is a debt that is owed and was incurred on marital property during the marriage." Rebecca also asserts that her "true argument" regarding the auto repair bill is that the circuit court's decision "stated [the bill] was previously paid off by marital funds [but it] was not. It was paid by [Rebecca's father] as a loan so the primary vehicle could be returned."

¶17    We conclude that Rebecca forfeited her current argument regarding the Dave's Auto Repair debt by failing to adequately raise that argument in the

6

circuit court. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."). Our review of the record shows that Rebecca attached to her property division worksheet two photographs of what appear to be two pages of an invoice from Dave's Auto Repair. The second page of the invoice includes a handwritten notation stating, "Paid $3,000." We can find no other evidence in the record regarding this invoice. There is nothing in the record to support Rebecca's current argument that the invoice was paid with funds loaned to her and Romero by her father. Thus, the only evidence before the circuit court regarding the Dave's Auto Repair debt consisted of Rebecca's property division worksheet stating that the debt existed and the attached photographs of the invoice showing that the debt had been paid.

¶18 To preserve an issue for appellate review, a litigant must raise the issue "with sufficient prominence such that the [circuit] court understands that it is being called upon to make a ruling." *Bishop v. City of Burlington*, 2001 WI App 154, ¶8, 246 Wis. 2d 879, 631 N.W.2d 656. Rebecca failed to do so here. Instead, she submitted evidence to the circuit court showing that the debt to Dave's Auto Repair had been paid. Rebecca never presented any evidence—or raised any argument—that the debt was paid using funds loaned by her father for which he expected repayment. Under these circumstances, we decline to consider Rebecca's argument regarding the Dave's Auto Repair debt. *See State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997) ("As a general rule, this court will not address issues for the first time on appeal.").

## IV. Contempt finding

¶19    In March 2021, a court commissioner entered a temporary order finding that, because the parties continued to live together in the marital residence, "they should split household bills and other marital expenses" during the pendency of the divorce proceedings. The temporary order required both parties to deposit their paychecks into a joint account and required Rebecca to pay specified marital bills out of that account.

¶20    Rebecca asserts that between March 16, 2021, and October 12, 2021, Romero "shorted" $20,122.36 from the joint account by failing to deposit his paychecks as ordered. As a result, Rebecca contends that Romero was "found in contempt" on October 12, 2021. Due to this contempt finding, Rebecca asserts that the circuit court should have ordered Romero to repay her $20,122.36. In response, Romero asserts that the court commissioner did not find him in contempt.

¶21    The record shows that on October 12, 2021, the court commissioner entered an order amending the March 2021 temporary order. The amended order provided that the parties were no longer required to deposit their paychecks into the joint account, and it made each party responsible for the payment of specified household expenses. The amended order further stated: "Husband is in contempt for disobeying the Temporary Order entered on March 31, 2021. He shall purge the contempt by making all payments as outlined in this Amended Temporary Order." Rebecca does not develop any argument—or cite any evidence showing—that Romero did not satisfy the purge condition by failing to make the payments required by the amended temporary order.

¶22    Thus, while the October 12, 2021 order shows that the court commissioner did find Romero in contempt, the court commissioner did not order Romero to pay back any funds that he had failed to deposit into the joint account. In her reply brief, Rebecca concedes that the court commissioner did not order Romero "to pay back the funds."  She asserts, however, that the court commissioner "clearly stated at the end of the hearing [that] this contempt finding would be resolved at the end of the divorce proceedings," and that Rebecca therefore expected the issue to be addressed in the circuit court's final order.

¶23    Again, we conclude that Rebecca forfeited this argument by failing to adequately raise it in the circuit court.  During the first day of the contested hearing, when the court asked Rebecca whether there was "anything else about this case that you want to tell me," Rebecca informed the court of Romero's purported violation of the March 2021 temporary order.  When the court asked Rebecca for documentation corroborating her assertions, Rebecca provided a "summary" that she had prepared and presented to the court commissioner, in which she asked the court commissioner to order Romero "to pay $20,122.36 back into the account by Friday, October 15, 2021."  In response to the court's follow up question—"Where can I go to find the order that ordered him to pay $20,122.36 into an account?"—Rebecca confirmed that Romero had never been ordered to pay that money back.  She further stated, "[T]hat was my desired outcome for the day."

¶24    The circuit court then stated: "So I'm not sure that I understand what you're saying then, because you said he was ordered to deposit a certain amount of money and didn't do it.  What happens to that money?  I think that's how you launched into this.  What happens to that?"  Rebecca responded, "Yeah," and she and the court then moved on to discuss another topic.  Rebecca never

followed up on her argument regarding Romero's purported violation of the temporary order.

¶25 On this record, we conclude that Rebecca failed to raise this issue with sufficient prominence that the circuit court understood that it was being called upon to make a ruling, and we therefore do not address the issue further.[3] *See Bishop*, 246 Wis. 2d 879, ¶8. In addition, Rebecca has failed to develop a cohesive argument on this issue in her appellate briefs. *See Papa v. DHS*, 2020 WI 66, ¶42 n.15, 393 Wis. 2d 1, 946 N.W.2d 17 (declining to address an underdeveloped argument).

## V. Student loans

¶26 The record shows that at the time of divorce, Rebecca had two outstanding student loans—a Great Lakes loan and a Navient loan. In her brief-in-chief, Rebecca asserts that the circuit court intended to divide these loans equally between the parties, but the property division balance sheet attached to the court's decision has an "X" under only the "Wife" column for the Great Lakes loan. According to Rebecca, Romero "is interpreting the order that he is not accountable for the Great Lakes loan due to the missing 'X'" in the "Husband"

---

[3] While Rebecca asserts that the court commissioner "clearly stated" at the end of the October 12, 2021 hearing that "this contempt finding would be resolved at the end of the divorce proceedings," the appellate record does not contain a transcript of that hearing, and we therefore have no way to verify the veracity of Rebecca's assertion. It is the appellant's burden to ensure that the record is sufficient for us to review the issues he or she raised on appeal, and we assume that any missing materials support the circuit court's decision. *See State Bank of Hartland v. Arndt*, 129 Wis. 2d 411, 423, 385 N.W.2d 219 (Ct. App. 1986). In any event, even if the court commissioner told Rebecca that this issue would be addressed in the circuit court's final decision, it was incumbent upon Rebecca to raise the issue with sufficient prominence such that the court understood that Rebecca expected it to make a ruling. *See Bishop v. City of Burlington*, 2001 WI App 154, ¶8, 246 Wis. 2d 879, 631 N.W.2d 656. As explained above, Rebecca failed to do so.

column. Rebecca asks this court to "update the order to clearly show Romero … is 50% accountable for the Great Lakes loan."

¶27 Romero disputes Rebecca's assertion that the circuit court intended to divide the student loans equally, and he instead contends that the court ordered an unequal division of the student loan debt. Romero is correct. In its written decision, the court expressly stated that it "chose to divide up the student debt unequally." Consistent with that statement, the property division balance sheet attached to the court's decision shows that the court chose to split the Navient loan equally between the parties but to make Rebecca solely responsible for the Great Lakes loan. Thus, the court clearly ordered an unequal division of the total amount of the student loan debt. Rebecca's argument that the court intended to divide the student loan debt equally therefore fails.

¶28 In her reply brief, Rebecca appears to argue for the first time that the circuit court erred by dividing the student loan debt unequally. We need not address arguments raised for the first time in a reply brief. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998).

¶29 Regardless, Rebecca's argument on this point is undeveloped. *See Pettit*, 171 Wis. 2d at 646-47 (court of appeals need not address undeveloped arguments). The circuit court provided multiple reasons for dividing the student loan debt unequally, noting that: (1) Rebecca will continue to benefit from her education following the divorce, whereas "[a]ny benefit [Romero] gets from this education will end with the divorce"; (2) Rebecca is eleven years younger than Romero; (3) Rebecca's earning capacity is increasing, due in part to her education; and (4) Romero will likely retire sooner than Rebecca, and "her ability to take her education and use it over a period of years to increase her earnings is greater than

11

his." Thus, the court provided a reasoned explanation for its decision to divide the student loan debt unequally, and Rebecca has failed to present a developed argument showing how the court erroneously exercised its discretion.

## VI. Child support

¶30 On the first day of the contested hearing in June 2022, Rebecca submitted a financial disclosure statement showing an annual gross income of approximately $63,300. Thereafter, on the final day of the contested hearing in September 2022, Rebecca testified that her annual salary had been reduced by $13,000 as of August 1, 2022. She asked the circuit court to take note of that fact for purposes of its decision. However, when calculating child support, the court used $63,300 as Rebecca's annual income. Rebecca asserts that the court erred in this regard because it "did not take [her] income change into account."

¶31 In response, Romero does not dispute that Rebecca's income was reduced to approximately $50,000 per year shortly before the final day of the contested hearing. Instead, he asserts—without any supporting citations to the record—that the circuit court properly calculated child support using an annual salary of $63,300 for Rebecca because: (1) Rebecca's work history, work experience, and "the degrees earned from her education" show that she is capable of earning more than $50,000 per year; and (2) Rebecca "willingly accepted" a change of position from her employer with a reduced salary one month before the last day of the contested hearing, such that her change in income was "by her choice." In her reply brief, Rebecca disputes these assertions—again, without any citations to the record—claiming that she was forced by her employer to either accept a lower-paying job or be terminated.

12

¶32 Our review of the record shows that no evidence was presented to the circuit court regarding the reasons for Rebecca's reduction in income. Rebecca merely testified that her annual income had decreased by $13,000, and she asked the court to take note of that fact for purposes of its decision. The court did not find Rebecca's testimony regarding her reduction in income to be incredible. Instead, when addressing the parties' respective incomes for purposes of determining maintenance, the court simply stated that it was using the income amounts shown on the parties' respective financial disclosure statements. The court further stated, "Each party provided testimony about their current earnings and the court is satisfied that each party is currently employed and working at a level that is productive and appropriate." Yet, the court did not explain why it discounted Rebecca's testimony regarding her reduction in income.

¶33 When setting child support, a circuit court must consider "*the circumstances existing at the time of the divorce*." **Wallen v. Wallen**, 139 Wis. 2d 217, 223, 407 N.W.2d 293 (Ct. App. 1987). Here, there was evidence in the record that Rebecca's actual income at the time of the divorce was approximately $50,000 per year, and Romero does not dispute that Rebecca's income decreased to that amount shortly before the final day of the contested hearing. The court, however, used Rebecca's previous, higher income when calculating child support, without any explanation for its decision to do so. The court did not, for instance, conclude that it should use Rebecca's earning capacity rather than her actual income when calculating child support based on a determination that Rebecca was "shirking." *See* **Chen v. Warner**, 2005 WI 55, ¶20, 280 Wis. 2d 344, 695 N.W.2d 758.

¶34 Under these circumstances, we conclude that the circuit court erroneously exercised its discretion when calculating child support.[4] We therefore reverse that portion of the court's judgment setting Romero's child support obligation and remand for the court to readdress that issue. On remand, the court should specifically consider the amount of Rebecca's income at the time of the parties' divorce. If the court decides to use Rebecca's earning capacity, rather than her actual income, it must explain its reasons for doing so.[5]

---

[4] At the end of its written decision, the circuit court stated:

> Many other assertions and claims were made during the course of the trial in this matter. As referenced above, each party was afforded an opportunity to submit a balance sheet outlining their various claims upon the marital estate. Any other claims by either party that the court has not addressed herein [are] denied based upon an insufficient record to support such claims. The court will not address each insufficient claim specifically, but references them here generally.

This statement—which appears to reference claims made by the parties specifically with respect to the property division—does not excuse the court's failure to explain why it discounted Rebecca's testimony regarding her reduction in income. "[T]he proper exercise of discretion contemplates that the circuit court explain its reasoning." *Randall v. Randall*, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737. Although we may search the record to determine whether it supports a discretionary decision, *see id.*, here, there is nothing in the record to suggest why the court may have discounted Rebecca's testimony.

[5] On appeal, Rebecca also argues that the circuit court erred by ordering that Romero's child support obligation would commence on January 1, 2023. Rebecca contends that Romero paid no child support from March 16, 2021, through December 31, 2022, and she argues that she is entitled to back child support for that time period.

(continued)

14

**VII.  Claiming the parties' minor child as a dependent for tax purposes**

¶35    Finally, Rebecca asserts that the parties had a "verbal agreement" that they would alternate claiming their minor child as a dependent for income tax purposes, beginning with Rebecca claiming the child as a dependent in 2020. Rebecca contends, however, that the circuit court did not address this issue in its decision and that, since the divorce, Romero has refused to comply with their verbal agreement.  In response, Romero asserts that there was no verbal agreement as to who would claim the minor child as a dependent.

¶36    During the first day of the contested hearing, Romero testified that he and Rebecca had agreed that he would claim their minor child as a dependent in odd years and Rebecca would claim the child as a dependent in even years. Rebecca, in turn, testified that she did not agree with Romero's recitation of their "agreement," but she wanted the circuit court to order that the parties would claim the minor child as a dependent in alternating years, and she had no preference as to whether she claimed the child in odd or even years.

¶37    The circuit court did not address which party would be permitted to claim the minor child as a dependent for tax purposes, and we agree with Rebecca that the court erred by failing to do so.  *See* WIS. STAT. § 767.511(1)(b) (requiring

---

Rebecca forfeited this argument by failing to raise it in the circuit court.  *See **Tatera v. FMC Corp.***, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810.  Notably, during the pendency of the divorce proceedings, both parties continued residing in the marital residence, and a court commissioner entered two temporary orders addressing each party's responsibility for various financial obligations.  Neither temporary order required either party to pay child support. Rebecca never sought de novo review of either temporary order, nor did she argue to the circuit court during the contested hearing that Romero should have been ordered to pay child support during the pendency of the divorce proceedings.  As noted above, this court need not consider arguments raised for the first time on appeal.  *See **State v. Van Camp***, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997).

a circuit court to "ensure that the parties have stipulated which party, if either is eligible, will claim each child as an exemption for" tax purposes and, in the absence of such an agreement, to "make the decision in accordance with state and federal tax laws"). Consequently, we direct the court to address this issue on remand.

## CONCLUSION

¶38  In summary, we affirm that portion of the circuit court's judgment addressing the division of the parties' marital estate. However, we reverse that portion of the judgment setting Romero's child support obligation, and we remand for the court to readdress that issue, specifically considering the amount of Rebecca's income at the time of the divorce. On remand, the court shall also address which party may claim Rebecca and Romero's minor child as a dependent for income tax purposes.

¶39  No costs to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.